# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
# CENTRAL DIVISION

| | |
|---|---|
| KARLA STREBEL,<br><br>Plaintiff,<br><br>v.<br><br>ROOSEVELT CITY POLICE DEPARTMENT,<br><br>Defendant. | **MEMORANDUM DECISION and ORDER**<br><br>Case No. 2:09-cv-00408-TC<br><br>Judge Tena Campbell |

The Roosevelt City Police Department (the Department) seeks summary judgment on all claims brought by Karla Strebel, a former Roosevelt City police officer, relating to alleged discrimination she experienced after she underwent knee surgery. Ms. Strebel brings claims for employment discrimination based on disability and gender and for retaliation because the Department refused to assign her hours as a result of her complaints of discrimination.[1]

After carefully reviewing the memoranda and exhibits filed by the party, the court grants in part and denies in part the Department's motion. Specifically, the court grants summary judgment for the Department on Ms. Strebel's claim for hostile work environment based on gender and disability because the harassment was not severe or pervasive. But the court denies summary judgment on Ms. Strebel's claim for discrimination under the Americans with Disabilities Act because there is a disputed issue of fact about whether Ms. Strebel is a qualified person with a disability and whether running and jumping are essential elements of Ms. Strebel's

---

[1] Ms. Strebel also initially brought claims for violation of the Equal Pay Act and 42 U.S.C. § 1983, which she now concedes should be dismissed.

job as a Roosevelt City police officer. The court also denies summary judgment on Ms. Strebel's retaliation claim because there is a disputed factual issue about whether the Department constructively discharged Ms. Strebel in retaliation for filing a grievance.

BACKGROUND[2]

The Department hired Ms. Strebel as a full time police officer in January 2007. On August 22, 2007, Ms. Strebel had knee surgery to repair an injury sustained outside of work. As a result of the surgery, Ms. Strebel's doctor restricted her for a time from running and jumping. The Department gave Ms. Strebel sedentary work assignments for two months, even though her doctor had merely restricted her from running and jumping. Her light duty assignments included secretarial work and court bailiff and security tasks.

During this time, her supervisor Sergeant Jeremy Chapman made jokes about her injury, calling her "gimp" and "cripple." He accused her of prolonging her light duty status to avoid working and made motions as if milking a cow when he passed her to imply that she was milking her injury. Officer Alan Tucker told her that he had recovered more quickly from the same surgery and Police Chief Rick Harrison made similar remarks about his son's recovery. Sergeant Chapman pressured Ms. Strebel to schedule a doctor's appointment so she could be cleared to return to full duty. After she returned to full duty, Sergeant Chapman told her on several occasions that he was keeping an eye on her.

Following her return to full duty, Ms. Strebel worked with no medical restrictions until she again injured her knee, this time while she was working. Her doctor confined her to

---

[2] Because Roosevelt City is moving for summary judgment, the court recites the facts in the light most favorable to Ms. Strebel.

sedentary activities for approximately one month. After that, the doctor instructed her not to run and jump. Ms. Strebel had another knee surgery in July 2008. Her doctor then directed that she do only sedentary work until January 2009, several months after she had resigned from the Department.

In early March 2008, when Ms. Strebel was medically restricted from running and jumping, Chief Harrison informed Ms. Strebel that he would not be able to give her full-time light-duty work, but that he could find hours so she could continue working.

On March 17, 2008, Sergeant Chapman yelled at Ms. Strebel in front of her co-workers about a mistake he believed she had made. Ms. Strebel claims he would not have yelled at a male police officer in the same way. The next day Sergeant Chapman and Chief Harrison told Ms. Strebel that she needed to fill out a worker's compensation claim and told her that she would be placed on unpaid medical leave when she had exhausted her sick leave. Chief Harrison took away her patrol car.

On March 25, 2008, Ms. Strebel delivered a letter to Chief Harrison complaining of Sergeant Chapman's treatment of her after her knee injury. The Department police department hired an investigator, who concluded that no discrimination had occurred. Ms. Strebel did not appeal the decision of the investigator because nobody in the Department told her the procedure for appealing an adverse decision.

After she delivered her letter to Chief Harrison, Ms. Strebel was assigned no work hours even though Rio Harrison, the chief's daughter, was brought in to do light duty assignments. Ms. Strebel resigned from her job as a police officer on September 8, 2008, after receiving no work and no pay for several months.

Although the Department claims that it did not provide light duty work assignments to other officers, Ms. Strebel disputes this fact. She maintains that the Department routinely gave such assignments to officers when officers had medical conditions, although none were on official medical restrictions like she was. Further, she contends that the Department accommodated others who could not run and jump, including Chief Harrison who walked with a limp. In addition, according to Ms. Strebel, the Department did not allow her to perform various duties that she was not medically restricted from performing such as street sweeping and meter reading.

Chief Harrison lists a number of complaints he had about Ms. Strebel's work including that she did not limit herself to light duty during the first medically restricted period, did not always show up to work as requested, and did not perform her work satisfactorily. These complaints were never shared with Ms. Strebel at the time and only arose after she submitted her March 25 letter to Chief Harrison. In May 2008, four disciplinary write-ups appeared in Ms. Strebel's file detailing these concerns.

ANALYSIS

The court grants summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." N. Natural Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).

I. Ms. Strebel's Disablity Claims

In analyzing Ms. Strebel's claims under the Americans with Disabilities Act (ADA), the

court must decide if Ms. Strebel is a "qualified individual" and whether she has a "disability." The ADA prohibits discrimination against qualified individuals with disabilities "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Smith v. Midland Brake, Inc., 180 F.3d 1154, 1161 (10th Cir. 1999) (quoting 42 U.S.C. § 12112(a)). "Merely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 195 (2002). To fall under the protection of the ADA "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." Holt v. Grand Lake Mental Health Ctr., Inc., 443 F.3d 762, 765 (10th Cir. 2006). Whether a plaintiff has a disability under the ADA is a question of law for the court to decide. Id. n.1.

A person is substantially limited in performing a major life activity if she is "[u]nable to perform a major life activity that the average person in the general population can perform [or is] . . . [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" in comparison with the general population. 29 CFR § 1630.2(j). To determine whether a plaintiff meets this standard, the court should consider "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id.; see also Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 196 (2002). The ability to work can be considered a major life activity if the impairment significantly restricts the individual's "ability to perform either a class of jobs or a

5

broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

Even if an employee does not qualify as a disabled person under the ADA, she can still bring claims under the ADA if her employer viewed her as a qualified person with a disability. Id. at § 1630.2(g). In such situations, the plaintiff must present evidence that her employer believed that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1087-88 (10th Cir. 2008). "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001) (citing Sutton v. United Airlines, 527 U.S. 471, 489 (1999)). In cases "where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual . . . the resolution of the issue of [whether the employee regarded an individual as a qualified disabled person] is properly left to the jury." Sutton, 527 U.S. at 489.

Ms. Strebel's knee injury does not rise to the level of impairment required under the ADA. But there is a factual issue about whether the Department believed Ms. Strebel to be a qualified person with a disability at the time of the alleged discrimination.

Ms. Strebel's initial surgery was to repair a knee injury. Although the surgery limited her ability to do all of her police officer duties, she was cleared to return to her full responsibilities

6

within about three months of her surgery. At the time she returned to full duty, neither she nor her supervisors anticipated that the surgery would have any long-term impact on her ability to fully perform her duties.

Ms. Strebel reinjured her knee at work in February 2008. On March 5, 2008, Ms. Strebel's new doctor informed her that she would need additional surgery to fix the first doctor's error. He restricted her from running or jumping. In July 2009, after reconstructive surgery, her doctor confined her to sedentary activities. Ms. Strebel's doctor lifted all medical restrictions, as expected, in January 2009, several months after Ms. Strebel left the police department. Moreover, the doctor's order that Ms. Strebel not run or jump did not substantially limit Ms. Strebel's ability to perform as a police officer generally, though it may have limited her from performing her duties as a police officer in the Department.[3] Even after the second injury and subsequent restrictions, because the impairment was not severe and was of limited duration with no expected long-term impact, Ms. Strebel's injuries did not render her a qualified person with a disability

Although Ms. Strebel was not, as a matter of law, a qualified person under the ADA, there is evidence that Ms. Strebel's supervisors, Sergeant Chapman and Chief Harrison, considered her to be disabled. Chief Harrison's initial reaction to the news that Ms. Strebel would be restricted in her police officer duties for a time was to offer to hold her job for six to nine months and to provide her with at least some hours that accommodated her medical

---

[3]It is unclear whether her knee injury in fact did prevent her from performing her duties as a Roosevelt City police officer. The record indicates that at least one other officer in the Department was not able to run and that due to the small size of the police department's jurisdiction that backup would be available to Ms. Strebel when she was on foot patrol should the need to run arise.

restrictions. This reaction would indicate that Chief Harrison considered her impairment to be temporary and not severe.

But Chief Harrison also restricted Ms. Strebel to only sedentary duties when her doctor had placed restrictions only on running and jumping. Later, Chief Harrison and Sergeant Chapman encouraged Ms. Strebel to apply for workers compensation benefits and informed her that she would be on unpaid disability during her restricted period. After placing Ms. Strebel on unpaid disability, Chief Harrison did not inform her of mandatory training, which she would be required to complete were she to continue as a police officer.

These actions indicate that Chief Harrison and Sergeant Chapman may have thought that Ms. Strebel's impairment was severe, would last a long time, and could have a long-term impact on her ability to work as a police officer. Therefore, there is a disputed issue of fact about whether Chief Harrison and Sergeant Chapman considered Ms. Strebel to be a qualified disabled individual.

II.     Ms. Strebel's Hostile Work Environment Claims

Ms. Strebel alleges that Sergeant Chapman's actions both after her initial injury and her second injury created a hostile work environment motivated by her gender and perceived disability. An employee can bring a hostile work environment claim under both Title VII and the ADA. Lanman v. Johnson, 393 F.3d 1151, 1155 (10th Cir. 2004). In both contexts, to survive summary judgment on a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1327

8

(10th Cir. 2004). The plaintiff must also show that the harassment occurred because of her protected status, in this case either because of Ms. Strebel's gender or her perceived disability. Id.

The court must examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." to determine whether a plaintiff has a claim for discrimination based on a hostile work environment. AMTRAK v. Morgan, 536 U.S. 101, 116, (2002). Although the conduct must have a discriminatory motive, "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct." Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005) (citations omitted). But if there is not evidence to support a discriminatory basis for the harassing conduct, the harassment is not actionable under Title VII or the ADA. See Riske v. King Soopers, 366 F.3d 1085, 1092 (10th Cir. 2004) (overturning a jury verdict finding sexual harassment because there was not sufficient evidence that the harassment was based on the Plaintiff's gender).

Courts have routinely held that isolated discriminatory comments do not rise to the level of a hostile work environment. See, e.g., Carrasco v. Boeing Co., 190 Fed. Appx. 650 (10th Cir. 2005) (holding that four sexually suggestive comments over a year did not create a hostile work environment); Sandoval, 388 F.3d at 1327 (holding that two sexist remarks did not create a hostile work environment).

As a matter of law, Ms. Strebel's claim that she was the victim of a hostile work

environment because of her gender or perceived disability fails.  Ms. Strebel points to several actions by Sergeant Chapman to support her claim: (1) he called her "gimp" and "cripple"; (2) he made milking motions to imply she was milking her injury; (3) he strongly encouraged her to have her medical restrictions lifted as soon as possible after her first knee surgery; (4) he told her on two occasions after her medical restrictions were lifted that he was keeping his eye on her; (5) he yelled at her in front of her colleagues on at least two occasions, which he would not have done to a male employee.  In addition, after her first surgery two of her co-workers commented that it was taking a long time for her to heal.

But this evidence does not demonstrate that Sergeant Chapman's actions were so severe and pervasive that they changed the terms and conditions of Ms. Strebel's employment. Moreover, Ms. Strebel was not a qualified individual with a disability after the first surgery and before the second injury.  Therefore, any comments made during that time were not actionable under the ADA.

III.    ADA Failure to Accommodate Claim

Ms. Strebel next argues that she was discriminated against because of her perceived disability because the Department failed to reasonably accommodate her.  "To succeed on an ADA claim, a plaintiff must show: (1) she is disabled as defined by the ADA; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered discrimination on the basis of her disability."  Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1261 (10th Cir. 2009).  "[O]ne who cannot perform the essential functions of the job, even with a reasonable accommodation, is not an 'otherwise qualified' individual."  Jarvis v. Potter, 500 F.3d 1113, 1121 (10th Cir. 2007).  "Essential

functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1); see also, Mason v. Avaya Communs., Inc., 357 F.3d 1114, 1119 (10th Cir. 2004). "Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job." Mason, 357 F.3d at 1119. The question of whether an employee can perform the essential functions of her job is a mixed question of law and fact. Rascon v. US West Comm., Inc., 143 F.3d 1324, 1333 (10th Cir. 1998).

The Department focused its argument on whether Ms. Strebel was a qualified disabled individual under the ADA and did not address whether Ms. Strebel was able to perform the essential functions of her job when she was restricted from running and jumping. Ms. Strebel responds by arguing that the Department failed to accommodate her, but does not specifically argue that she could perform the essential functions of her job. In various parts of her complaint and opposition brief, Ms. Strebel states that other police officers at the Department who had less formal medical restrictions have been able to perform the essential function of their job with reasonable accommodation. She further states that Chief Harrison refused to consider offering her any work that was not sedentary even when her doctor informed him that she was only restricted from running and jumping. The Department counters that it does not have any official light duty positions that would accommodate Ms. Strebel's disability and that running and jumping is an essential function of being a patrol officer. Although the parties do not appear to

11

have thoroughly considered whether running and jumping is an essential function, a material issue of fact exists on that issue. If she could perform the essential functions of her job with reasonable accommodation, the Department may have discriminated against her because of her perceived disability when it did not assign her hours or attempt to accommodate her medical restrictions.

III. Ms. Strebel's Retaliation Claim

Ms. Strebel argues that the Department retaliated against her by not assigning her any light-duty hours after she submitted her March 25 letter to Chief Harrison. A prima facie case of retaliation requires Ms. Strebel to show "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Proctor v. UPS, 502 F.3d 1200, 1208 (10th Cir. 2007). Once Ms. Strebel has established a prima facie case of retaliation, the burden shifts to the Department to put forth a nondiscriminatory reason for the materially adverse action. Id. If the Department provides a nondiscriminatory reason, the burden shifts back to show that the Department's proffered reason is pretextual. Id.

In this case, Ms. Strebel engaged in protected opposition to discrimination when she requested that the police department accommodate her disability at the March 18 meeting and when she wrote her March 25 grievance letter. Ms. Strebel's grievance describes the actions taken by the Roosevelt Police Department in response to her medical condition. These actions constitute protected activity under the ADA.

The Department argues that there can be no retaliation claim because Ms. Strebel

voluntarily resigned from the Department. "An employee is constructively discharged when the employer by his illegal discriminatory acts makes working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." Hall v. United States DOL, 476 F.3d 847, 851 (10th Cir. 2007); see also Sanchez v. Denver Pub. Sch., 164 F.3d 527, 534 (10th Cir. 1998); Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986). The finder of fact could conclude that the Department's failure to allow Ms. Strebel to work in the five months after she filed her grievance would compel a reasonable person in her position to resign.

The Department also argues that Ms. Strebel cannot make a causal connection between the Department's refusal to provide Ms. Strebel with light-duty work and her grievance because the subject of her grievance was that the police department had informed Ms. Strebel that no light-duty work would be available. But Ms. Strebel claims that before she filed the grievance, Chief Harrison told her that at least some light-duty work would be available. Ms. Strebel contends that after she submitted her grievance letter to Chief Harrison the Department did not give her any light-duty work even when such work was available. Further, in May 2008, four disciplinary write-ups about Ms. Strebel's deficient performance appeared in her file. The proximity in time of these actions to Ms. Strebel's grievance indicates that there may be a causal connection between Ms. Strebel's protected activity and the Department's constructive discharge of her.

Based on the above, the court concludes that Ms. Strebel has established a prima facie case of retaliation. The Department responds that it had a legitimate business reason for its actions. It states that Ms. Strebel was unable to perform her functions as a police officer and that

13

no light-duty status was available. It also points to deficiencies in Ms. Strebel's performance when she was on light-duty status after her first surgery. Finally, the Department claims that its insurance company informed it that having Ms. Strebel perform work while on medical restrictions posed an undue liability risk.

The burden then shifts to Ms. Strebel to put forth evidence of pretext, which she does. A plaintiff can show pretext "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence. . . ." MacKenzie, 414 F.3d at 1278 (citations omitted). "Evidence of pretext may include prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. Colo. 2005)(citations omitted). The court must "consider the facts as they appeared to the person making the decision, and [the court does] not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." Riggs, 497 F.3d at1118-1119.

Ms. Strebel points out several inconsistencies in the Department's legitimate business reason for not assigning her work hours. Before Ms. Strebel filed the grievance, Chief Harrison had indicated that at least some light-duty work would be available. Nobody had ever told Ms. Strebel of her deficient performance until the write-up appeared in her file in May 2008. Ms. Strebel documents several times when light-duty work appears to have been available, yet she was not contacted to perform the work. Further, several other Roosevelt City police officers

were allowed to work with medical limitations. Taken together, these facts are sufficient to create an issue of fact about whether the Department retaliated against Ms. Strebel for filing her grievance.

## ORDER

The court GRANTS in part and DENIES in part the Department's motion for summary judgment. The court grants summary judgment for the Department on Ms. Strebel's hostile work environment claims based on gender and disability but denies summary judgment on Ms. Strebel's ADA and retaliation claims. The court DENIES as moot Ms. Strebel's motions for leave to file an amended memorandum in opposition (Dkt. No. 16) and her motion for leave to file corrected title (Dkt. No. 17).

DATED this 10th day of December, 2010.

BY THE COURT:

_____
TENA CAMPBELL
Chief Judge